UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| HANDS ON PREMIUM CAR WASH, LLC | ) | CASE NO: 25-20255 |
| Debtor | ) | |
| HANDS ON PREMIUM CAR WASH, LLC | ) | |
| Plaintiff | ) | |
| vs. | ) | ADVERSARY NO: _____ |
| ELAINE KARAGAN | ) | |
| Defendant | ) | |

## COMPLAINT

Comes now Hands on Premium Car Wash, LLC (the "Debtor" or "Plaintiff") and for its Complaint against Elaine Karagan (the "Defendant"), and states:

1. On February 18, 2025, Debtor, an Indiana Limited Liability Company, filed a Petition for Relief under Chapter 11 of Title 11 of the United States Code.

2. Defendant is a resident of Lake County, Indiana.

### Jurisdiction and Venue

3. This Court has jurisdiction over this Adversary proceeding pursuant to 28 U.S.C. §1334(b) because this adversary proceeding arises under, arises in, and is related to a Chapter 11 case, *In re Hands On Premium Car Wash, LLC*, Cause No: 25-20255, which is pending in the United States Bankruptcy Court for the Northern District of Indiana, Hammond Division. Venue is proper in this Court pursuant to 28 U.S.C. §1409(a) in that Debtor's Chapter 11 case is pending in this district and division.

4. This matter is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(A)(H) and (O).

**Factual Allegations**

5. Defendant as Landlord and Plaintiff as Tenant are parties to a Ground Lease dated August 9, 2007, which was amended by a First Amendment to Ground Lease dated June 1, 2020, (the Ground Lease and the First Amendment to Ground Lease are hereinafter collectively referred to as the "Lease"); a true and accurate copy of which are attached hereto as Exhibit "A". The Lease commonly relates to the property known as 8445 Wicker Avenue, St. John, Indiana ("Premises").

6. The Lease was originally between Nick Karagan and Elaine Karagan as Landlord, but Nick Karagan passed away on November 19, 2019. As a result of Nick Karagan's passing, Elaine Karagan became the sole owner of the Premises and the sole Landlord under the Lease.

7. Shortly thereafter, Plaintiff commenced construction of a structure that housed a car wash, car detailing, and at that time a restaurant. A list of the final costs for the construction of the building and the equipment that was located in the building is attached hereto, incorporated herein and marked as Exhibit B.

8. To finance the construction of the building and the purchase of the equipment, the Plaintiff borrowed from First National Bank of Illinois ("Wintrust"), the sum of $923,675.00, an SBA guaranteed loan in the amount of $555,000.00 ("SBA-1") and from its owners, an investment in the amount of $369,470.00. There are still balances owed on the Wintrust obligation and the original SBA-1.

9. On or about September 20, 2021, resulting from the financial difficulties Debtor was experiencing from being closed during Covid, it obtained a loan from the SBA as part of the Community Advantage Initiative in the original amount of $175,000.00, ("SBA-2").

10. Hands On Premium Car Wash, LLC ("Hands On") was initially incorporated on July 27, 2006, as an Indiana Limited Liability Company. Accountants for the business suggested that Hands On should lease the building and equipment to an operating entity. To that end, Gentle Touch Car Wash, LLC was incorporated as an Indiana Domestic Liability Company, approximately 9 months later on May 25, 2007. Hands On was administratively dissolved on February 3, 2012 and Gentle Touch was administratively dissolved on December 15, 2010. Thereafter, on March 24, 2014, Hands On Premium Car Wash, LLC (the current "Debtor") was formed and a Certificate of Organization was issued. On March 24, 2014, approximately 6 hours after the incorporation of Debtor, Gentle Touch Car Wash, LLC was incorporated. Copies of the Articles of Organization for both entities are attached hereto, incorporated herein and marked as Exhibit "C" for Debtor and Exhibit "D" for Gentle Touch.

11. Thereafter, Plaintiff continued to lease the Real Estate and Equipment to Gentle Touch and it continued to operate the business.

12. During the year 2023, it became apparent that as a result of Covid and adverse weather conditions, that the Debtor could not continue to operate effectively and the sale of the business was explored.

13. Late in November of 2023, Plaintiff met with Duke of Oil representatives regarding the assignment of Debtor's land lease with Karagan, and the sale of the building and equipment. This was a preliminary meeting and Duke of Oil expressed interest but needed more information regarding the Lease. Duke of Oil advised it had no problem with the Lease because it leased most of its locations and further said it knew Peter Karagan who was acting as attorney-in-fact and representative of Defendant in all the transactions.

14. The Plaintiff continued to meet with Duke of Oil who was expending money on plans and acknowledged it had talked to the Landlord's representative, Peter Karagan. Due to the fact that Duke of Oil had planned to perform oil changes in the location, it required a variance. On January 30, 2024, representatives of Debtor and Duke of Oil met with the Building Department of the Town of St. John to negotiate approval of the proposed Plans. Approval was obtained and Plans were to go before the Town Board with both representatives of Duke of Oil and Debtor being present.

15. In early March 2024, the Plans were significantly changed and the project required redrafted plans to submit to the Town of St. John. Debtor's principal shepherded the project through the meetings with the Town of St. John. During this period of time, Duke of Oil acknowledged conversations with Peter Karagan. On March 6, 2024, Duke of Oil and representatives of Debtor went to the Town of St. John meeting and final hearing was set to take place on April 3, 2024 with the St. John Town Council.

16. On April 9, 2024, a Letter of Intent was signed; a copy of the Letter of Intent is attached hereto, made part hereof, and marked Exhibit "E". It was for the amount of $500,000.00 which was not sufficient to liquidate the current liens against the Premises.

17. A meeting was held on April 10, 2024, with Wintrust, who is in the first position, which advised Duke of Oil representatives that it was not willing to take a "haircut". On April 24, 2025, the Town of St. John Council gave final approval to the proposed project.

18. Negotiations were ongoing through May of 2024, with the lending institutions. A final amount was arrived at wherein Wintrust would agree to accept $319,318.37, Business Development Group-SBA1 would accept $171,707.21; taxes due at that time in the amount of $24,344.00 would be paid, and that Bankable-SBA2 would accept $139,781.46 for a total of

$655,201.00.

19. By June 17, 2024, the Letter of Intent increased to $600,000.00 but still was not sufficient to cover the debts and taxes.

20. Late in June of 2024, Duke of Oil paid two payments of rent in the amount of $5,833.00 per month and late fees of $300.00. Debtor's business was such that customers knew there was going to be a sale and Debtor had previously sold numerous coupons which were now being utilized so there was not sufficient cash flow to pay rent and other expenses.

21. On June 28, 2024, the proposed agreement was sent to Debtor, a copy of which is attached hereto, made a part hereof and marked Exhibit "F".

22. Thereafter, Debtor's counsel advised Duke of Oil that certain aspects of the Contract were not acceptable; namely that Gentle Touch was to be a party. Counsel for Debtor requested a conference with the Duke of Oil and Wintrust to attempt a resolution of the various issues. Duke of Oil refused to participate in any conference.

23. Karagan's counsel advised Debtor's counsel that during this period of time, Duke of Oil's counsel had suggested that Karagan declare a default, terminate the contract and they would just deal with Defendant. This refusal of Duke of Oil to meet or discuss led Debtor's counsel to send an email, a copy of said email is attached hereto, made a part hereof, and marked as Exhibit "G".

24. On or about August 20, 2024, after discussing the filing of bankruptcy for Gentle Touch, Debtor proposed to Duke of Oil's counsel to use a state court quiet title action or the filing of Chapter 11 for Debtor and using Duke of Oil as a stalking horse bidder to sell the property free and clear.

25. On August 28, 2024, Plaintiff's counsel forwarded a copy of the revised contract to

Duke of Oil's counsel; a copy of the revised Contract is attached hereto, made a part hereof and marked as Exhibit "H".

26. On August 29, 2024, in response to a question posed by Duke of Oil's counsel, an email forwarding a copy of the Lease between Debtor and Gentle Touch was forwarded to Duke of Oil's counsel; copies of said email and Lease are attached hereto, made a part hereof and marked as Exhibit "I".

27. On September 12, 2024, Duke of Oil responded with a statement that creditors of Gentle Touch would have to be noticed in any suit. A copy of that email and the email response of Debtor's counsel, are attached hereto, made a part hereof, and marked as Exhibit "J". To date there has not been any response received to this last email from Debtor's counsel.

28. During the time of negotiations with Duke of Oil, Debtor continued to look for additional purchasers. On September 17, 2024, it received a Letter of Intent for purchase price of the building and equipment for the sum of $690,000.00. However, this was conditioned upon the sale of the underlying real estate and a proposal was submitted to Defendant.

29. On September 25, 2024, a copy of the offer was forwarded to Defendant's counsel. This offer was not accepted because Karagan's counsel advised the Defendant had no interest in selling the real estate. Continued negotiations between the additional purchaser and the Debtor culminated on October 15, 2024, when an amended purchase contract was presented to Karagan by Debtor's counsel. This offer was for $690,000.00 and did not include the purchase of the real estate. It did include as a condition for an additional five year extensions at $5,000.00 annual increments (the amount of annual increments provided for in the Lease). In response to this offer, the Landlord forwarded a Notice dated October 15, 2024, of termination of the Lease. A copy of the email and

Notice is attached hereto, made a part hereof and marked as Exhibit "K".

30. On information and belief that the actions of the Duke of Oil in requiring conditions which could not have been complied with as part of its offer to purchase and its failure to respond to Debtor's September 12, 2024, email and Defendant's termination letter in response to a better offer to purchase Debtor's interest in the Lease and equipment was part of a scheme to fraudulently divest Debtor of its leasehold interest in the building and equipment.

31. On information and belief that Landlord intends to lease the property if it is successful in terminating Debtor's Lease to Duke of Oil.

32. The termination requirement of the Lease requires the transfer of all the building and equipment to Landlord upon termination. It further provides that there is no additional rent accruing at the time. The value of the equipment and building as evidenced by the construction and purchase prices, and listed on the Debtor's Schedules are significantly greater than the amount due and owing to the Defendant which would be ten months rent at $5,833.00 per month plus real estate taxes in the approximate amount of $28,500.00.

### COUNT I
### Avoidance of Unlawful Terminations
### (Actual Fraudulent Transfer Actions-11 U.S.C. §§ 548, 550 and 551)

33. Plaintiff restates and realleges Paragraphs 1 through 32 of this Complaint as if fully set forth herein.

34. The purported termination of the Lease occurred within two years of the date of filing of Debtor's Petition.

35. Unlawful termination constitutes transfers of Debtor's property interest.

36. The unlawful and fraudulent termination was made with actual intent to hinder, delay

or defraud the creditors of Debtor and to take the Debtor's Property.

37. Debtor received less than reasonably equivalent value in exchange for the unlawful termination.

38. The transfers were made with the actual intent to hinder, delay and defraud creditors of the Debtor in that the transfers were made in furtherance of the Defendant's scheme to divest the Debtor of its interest in the land lease and the building and equipment and transfer the same to a third party for a lesser amount.

39. That, alternatively, the transfers were fraudulent without an actual intent to hinder, delay and defraud creditors for the reason that the Debtor did not receive reasonably equivalent value in exchange for the transfers because the amount of any debt owed to the Defendant were significantly less than the value of the assets.

40. Debtor was insolvent on the date of the unlawful terminations or became insolvent as a result thereof, were engaged in a business or transaction or were about to engage in a business or transaction for which any property remaining with Debtor was unreasonably small capital, and intended to incur a belief that it would incur debts that were beyond their ability to pay as such debts matured.

41. Defendant is the initial transferee of the unlawful terminations.

WHEREFORE, Debtor requests that the Court enter an order (a) avoiding, recovering or preserving for the benefit of Debtor's estate the transfers through the unlawful termination (b)

awarding interest and costs including attorneys fees incurred in prosecuting this action; (c) granting the debtor such further relief in its favor as the Court finds just equitable and appropriate.

                                                  DANIEL L. FREELAND & ASSOCIATES, P.C.

                                                  */s/ Daniel L. Freeland*
                                                  Daniel L. Freeland
                                                  Attorney for Plaintiff/Debtor

## COUNT II
## CLAIM AGAINST DEFENDANT FOR FRAUDULENT CONVEYANCE PURSUANT TO INDIANA CODE §32-2-7-14 AND 11 U.S.C. §544.

Plaintiff restates and realleges Paragraphs 1 through 41 of this Complaint as if fully set forth herein.

42. The transfers were fraudulent as to the creditors of Debtor that arose prior to the date of those transfers and are now creditors and claimants in Debtor's bankruptcy case.

43. That the transfers are recoverable to present or future creditors of the Debtor.

WHEREFORE, Debtor requests that the Court enter an order (a) avoiding, recovering or preserving for the benefit of Debtor's estate the transfers through the unlawful termination (b) awarding interest and costs including attorneys fees incurred in prosecuting this action; (c) granting the debtor such further relief in its favor as the Court finds just equitable and appropriate.

                                                  DANIEL L. FREELAND & ASSOCIATES, P.C.

                                                  */s/ Daniel L. Freeland*
                                                  Daniel L. Freeland
                                                  Attorney for Plaintiff/Debtor
                                                  9105 Indianapolis Blvd.
                                                  Highland, IN 46322
                                                  PH: (219) 922-0800
                                                  dlf9601@aol.com